IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


REVEREND DAVID SIPP,

        Plaintiff,

  vs.                                     No. CIV 01-1418 LFG/DJS

UNUM PROVIDENT CORPORATION and
PAUL REVERE LIFE INSURANCE COMPANY,

        Defendants.


## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on four separate motions: (1) Plaintiff's motion to strike the affirmative defense of failure to mitigate [Doc. 20]; (2) Defendant's motion to strike Plaintiff's summary judgment evidence [Doc. 34]; (3) Plaintiff's motion for partial summary judgment [Doc. 27]; and (4) Defendant's cross motion for partial summary judgment [Doc. 33].

The Court has reviewed the briefs and evidence submitted in connection with these motions. No oral argument is necessary. For reasons given below, Plaintiff's motion to strike is granted; Defendants' motion for partial summary judgment is granted; and the two remaining motions are granted in part and denied in part.

## Factual and Procedural Background

This is a contract dispute about disability insurance coverage. Plaintiff David Sipp ("Sipp"), a former pastor, purchased a policy in 1986 from the Defendant insurance companies (hereafter referred to jointly as "Defendants"), insuring him against disability which would preclude him from

performing "the important duties of his regular occupation."

Alleging a disability based on asthma, with a secondary diagnosis of depression, Sipp left his position as pastor with a New Jersey congregation, and in January 2000, he applied for partial disability benefits under the policy. He states in his complaint that he became totally unable to work in April 2000, and he therefore resigned his position, and he and his wife thereafter moved to New Mexico "for drier air."

Prior to his resignation, he had been treated extensively for asthma and had also been seeing a mental health counselor, William Sanderson, L.C.S.W. After moving to New Mexico, Sipp began treatment in December 2000 with his primary care physician, Jim Cardasis, D.O., and he and his wife began treatment with family counselor Debra Wirth, L.P.C.C., on February 20, 2001. Ms. Wirth referred Sipp to Jafet Gonzales, M.D., a psychiatrist, and Sipp was examined by Dr. Gonzales in April 2001. Dr. Gonzales recommended continued counseling, and Sipp thereafter began treatment with Harry Linneman, Ph.D., a psychologist. He was still in treatment with Dr. Linneman at the time he filed his complaint.

Defendants initially approved Sipp's application for disability benefits, and he received some payments under the policy. However, on May 21, 2001, Defendants informed Sipp that his benefits would cease, as his asthma had improved since his move to New Mexico and they did not find evidence of a psychological disability.

On November 20, 2001, Sipp filed suit in New Mexico state court to reinstate the disability benefits. The case was removed to U.S. District Court by Defendants on December 19, 2001, on the basis of diversity jurisdiction. In his complaint, Sipp alleged the following causes of action:

(1) breach of the insurance contract by unjustifiably discontinuing benefits, by failing to supply

Plaintiff with certain documents in violation of Defendants' contractual obligations to provide a fair appeals process, and by failing to pay the full amount due under the policy;

(2) unfair insurance practices in violation of unnamed statutory and regulatory provisions, in that Defendants cited a phone conversation with Plaintiff's doctor as a basis for terminating benefits; wrongly implied that a psychiatric illness is required for coverage, and that "stressful life events" are not sufficient; and failed to provide substantial medical reasons for discontinuing benefits;

(3) negligent misrepresentation based on Defendants' alleged "inaccurate and untrue" statements to Plaintiff regarding his eligibility, which were intended to deceive him and wrongfully deny him payment of disability benefits; and

(4) a claim for punitive damages, based on allegations that Defendants' actions were malicious, willful, and in intentional or reckless disregard of his rights.

On June 6, 2002, Sipp filed a motion to amend the complaint [Doc. 18], seeking to add new claims, including a cause of action under the New Mexico Unfair Insurance Practices Act, N.M.S.A. § 59A-16-1 *et seq.*; a cause of action under the Unfair Practices Act, N.M.S.A. § 57-12-1 *et seq.*; a claim for bad faith in insurance claims handling; and a claim for repudiation of the contract.

Defendants opposed this motion, arguing that the request was untimely. The deadline to amend the pleadings had expired long before Sipp filed his motion to amend, and discovery was nearly complete. Defendants argued that they would be prejudiced by amendment at this late date. The Court agreed and denied the motion to amend [Doc. 32], and the case is now proceeding on the claims as originally set forth in the complaint.

The parties submitted cross motions for summary judgment on issues relating only to liability. In addition, Defendants ask the Court to strike certain evidence submitted by Sipp in connection with

his motion for summary judgment. Finally, Sipp seeks to strike the affirmative defense related to failure to mitigate damages.

## Discussion

### I.
### Plaintiff's motion to strike mitigation defense

Defendants include in their answer the affirmative defense that Sipp failed to mitigate his damages. Sipp seeks to have this defense stricken to the extent that mitigation would require him to seek alternative employment. The Court will grant the motion to the limited extent specified by Plaintiff.

The policy at issue in this case is an "own occupation" policy as opposed to an "any occupation" policy. The policy defines "total disability" to mean that, because of injury or sickness, the insured is (1) unable to perform the important duties of his regular occupation; (b) he is not engaged in any other gainful employment; and (3) he is under the regular and personal care of a physician.

Because of this language, Sipp qualifies as totally disabled if he shows that he cannot perform the duties of his regular occupation as pastor, even if he could engage in other occupations. In a case involving a policy which defined "total disability" as "complete inability of the Insured due to injury or sickness to perform each and every duty pertaining to his occupation," the New Mexico Supreme Court held that the evidence established such inability, and the fact "[t]hat the plaintiff's employer had closed his office and that she had not sought other employment does not require a contrary finding." Sawyer v. Wash. Nat'l Ins. Co., 78 N.M. 201, 203, 429 P.2d 901, 903 (1967).

Thus, even if Sipp has the ability to work at some occupation other than being a pastor, this

does not disqualify him from coverage. Defendants contend, however, that the duty to mitigate or lessen one's own damages is an integral part of any plaintiff's responsibility. Thus, Defendants argue that even if Sipp is eligible for coverage, he nevertheless has the usual common law duty to mitigate damages, and he must do this by looking for other gainful employment. Sipp responds that, in this situation, "[t]he insurance policy must trump the common law," and that Defendants are attempting by their language to change the "own occupation" policy into an "any occupation policy." The Court agrees.

As Sipp points out, Defendant's claims supervisor, Michael Speroni, conceded in his deposition that Sipp was not required under the terms of the policy to go out and seek other work. (P's Ex. to motion to strike). In addition, it is clear from the language of the policy that the risk the insurer undertook was the risk that Sipp would be unable to work in his regular occupation as a pastor, not the smaller risk that he would be unable to work at any occupation whatsoever. The risks are different. The chance of being disabled from working at one particular occupation is a significantly different risk than the chance of being disabled from doing any sort of work at all; therefore, the premiums for insurance against the former circumstance are presumably much higher than for the latter, since there is more likelihood that the insurer will have to pay out. Defendants in this case received the benefit of these higher premiums, and they cannot now avoid their contractual obligation to pay the benefits which they agreed to pay, by claiming that Sipp has a duty to "mitigate" damages by looking for other work.

Plaintiff is correct in asserting that, by this argument, the insurer is attempting "to change the 'own occupation' policy effectively into an 'any occupation' policy." Indeed, if Sipp did go out and find paid work, even of a very menial sort, he would disqualify himself from coverage under the

policy definition of "disabled," which includes a requirement that he not be engaged in gainful employment. Accepting Defendants' argument would force Sipp into a classic "Catch-22" scenario.[1] To comply with a duty to mitigate while he pursues a claim for disability, he would have to work. Yet, if he works, he disqualifies himself from the definition of disability. In this unique situation, the common law duty to mitigate by seeking other employment is simply "trumped," as Plaintiff puts it, by the language of the policy, language to which both parties agreed by entering into the contract.

Defendants also argue that Sipp failed to mitigate damages by not going back to work when his physician released him to return. If this alleged fact – *i.e.*, that Sipp was "able to perform the important duties of his regular occupation" – can be established, it is relevant to whether Sipp fell within the policy definition of "total disability," an issue discussed below in connection with the summary judgment motions. There is no need to consider it here, in the context of Sipp's alleged failure to mitigate damages.

Finally, Defendants argue that Sipp also failed to mitigate his damages by not seeking psychiatric care and by not taking antidepressant medications prior to April 2001. These facts, if they can be established, are relevant to whether Sipp is eligible for coverage in the first place, as they go to whether he was "under the regular and personal care of a physician," one of the elements of the policy definition of "total disability." However, as with the claim that Sipp's doctor released him to return to work, these arguments are more appropriately considered in connection with the "total disability" issue discussed elsewhere in this opinion, and there is no need to consider them here, in the context of Sipp's alleged failure to mitigate by not taking steps which would enable him to go out

_____

[1]This phrase was popularized by Joseph Heller in his novel Catch-22. It has come to mean an absurd circular logic or paradox in practice, law or regulation that makes one a victim of its provisions no matter what one does. Webster's New World Dictionary 224 (2d Coll. ed. 1980).

and find alternative work.

Defendants also argue that Sipp's failure to seek psychiatric care establishes a failure to mitigate in that, if Sipp had sought medical advice earlier and followed prescribed treatment, this would have enabled him to continue or return to his usual work as a pastor. The Court rejects this argument. The non-defaulting party under a contract does have a duty to use reasonable diligence to mitigate damages. Elephant Butte Resort Marina, Inc. v. Wooldridge, 102 N.M. 286, 292, 694 P.2d 1351, 1357 (1985). However, actions Sipp should have taken prior to the contract breach are not subject to the duty to mitigate, Id.; and, in any case, it is mere speculation that psychiatric treatment would have prevented Sipp's disability, and "such speculative, uncertain and contingent possibilities cannot be taken into consideration in mitigation of damages" in contract cases. Pillsbury v. Blumenthal, 58 N.M. 422, 429, 272 P.2d 326, 330 (1954).

In any event, Sipp asserts only that:

> Plaintiff respectfully requests that the affirmative defense of failure to mitigate damages, in Paragraph 47, be stricken with respect to any alleged failure to mitigate any economic or psychological damage by not having sought or obtained alternate employment. While such defense in employment or injury cases are [sic] frequently argued, see NM-UJI 13-811, Plaintiff here was under no obligation to find alternative work.

And in his reply brief, he states, "This motion does not seek to impair the defense of mitigation on any other ground, but relates to the attempt to change the 'own occupation' policy effectively into an 'any occupation' policy."

Thus, Sipp does not ask that Court to strike the affirmative defense entirely; he asks only for a ruling that his duty to mitigate does not include the duty to go out and seek non-pastoral employment, and that his damages should not be reduced because of his failure to do so. The Court

therefore holds that, although Sipp does have a general duty to mitigate damages, "mitigation" does not include the duty to seek alternative employment, under the circumstances of this case. The motion to strike will be granted, in the limited manner framed by Sipp.

## II.
## Defendant's motion to strike summary judgment evidence

Defendant argues that several pieces of evidence offered by Sipp in support of his motion for partial summary judgment should be stricken, because they have not been authenticated and constitute hearsay. This motion is denied in principal part, except as it relates to two letters from Plaintiff's counsel, as discussed below.

Evidence submitted to support or oppose a motion for summary judgment need not be strictly in a form that would be admissible at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324,106 S. Ct. 2548, 2553 (1986); Aramburu v. The Boeing Co., 112 F.3d 1398, 1401 (10th Cir. 1997). However, some materials are not appropriate for summary judgment consideration. Aramburu, at 1401. For example, materials constituting hearsay, which do not fall within any of the hearsay exceptions, cannot support or defeat summary judgment. Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995); Gross v. Burggraf Const. Co., 53 F.3d 1531 (10th Cir. 1995). And evidence must be authenticated to be considered in connection with a summary judgment motion. Foster v. AlliedSignal, Inc., 293 F.3d 1187, 1191 n. 1 (10th Cir. 2002).

Several of the medical reports and treatment notes submitted by Sipp in support of his motion for partial summary judgment were not authenticated. However, Plaintiff belatedly submitted authenticating affidavits from the medical providers, in his response to Defendant's motion to strike. Although this is not good practice, the authenticting affidavits are now before the Court, and Sipp

should not be prejudiced by his counsel's inadvertence. Since the lack of authentication has been rectified, these materials will be considered in connection with the summary judgment motion. This includes exhibits numbered 9a, 9b, 23, 33, 34, and 35.

In addition, Plaintiff points out that exhibits 9a and 9b[2] are part of Plaintiff's claims file and were originally obtained from Defendants, and that Defendants relied on these medical records in making their disability determination. The Court will allow them in.

Exhibits 11 and 12 are also medical records. Although Plaintiff supplies no authentication for these records, he does point out that Defendants also included these records in their Appendix in connection with this motion and "presumably no longer object." Defendants do not specifically address this statement in their Reply, and these items will not be stricken.

Exhibit 14 is another set of medical notes of ongoing treatment for psychological problems. Although the notes are not authenticated, Plaintiff argues that Defendants' psychologists referred to these records and relied on them in evaluating Plaintiff's claimed disability, and the records should be considered as evidence of the fact that that particular treatment occurred. These records will be allowed.

Exhibits 28 and 29 are letters from Plaintiff's counsel requesting information from Defendants' claims representative Barbara Fawcett. The letters are not authenticated, although they easily could have been. These documents will be stricken.

III.
The cross motions for partial summary judgment

In these motions, Sipp seeks a ruling in his favor on the issue of liability only, and Defendants

---

[2] These exhibits were variously mis-characterized in the briefs by both parties as exhibits "9 and 9b," and "9 and 9a"; there is no exhibit "9" as such, only 9a and 9b.

seek dismissal of the action against them on Plaintiff's extra-contractual causes of action. As a matter of law, Sipp has established that he is entitled to disability benefits under the contract, and his motion will be granted to this extent.

Defendants, on the other hand, have established as a matter of law that they are not liable under Plaintiff's claims of unfair insurance practices and negligent misrepresentation, and that they are not liable for punitive damages, and their motion for partial summary judgment will be granted with respect to these claims.

As noted above, the Court denied Plaintiff's motion to amend the complaint to add additional claims, leaving three basic causes of action, as alleged in the original complaint, to be considered in determining whether summary judgment should be granted on behalf of either party on the issue of liability. Plaintiff also asserts that punitive damages should be awarded because Defendants acted maliciously.

A. <u>Breach of contract</u>

Under the "breach of contract" heading, Plaintiff alleges that Defendants breached the insurance contract in three ways: (a) by discontinuing benefits; (b) by failing to supply Plaintiff with certain documents, in violation of their contractual obligation to provide a fair appeal process; and (c) by failing to pay the full amount due under the policy in that they did not take into account all of Plaintiff's "earnings package," including his use of the parsonage.

Sipp has established that there are no material factual issues to be resolved as to whether he falls within the contractual definition of "totally disabled." The Court therefore finds, as a matter of law, that Defendants breached the insurance contract by discontinuing benefits on grounds Sipp is not "totally disabled." Having found a breach of contract, it is unnecessary for the Court to make a

ruling on the other two grounds asserted. In particular, the Court notes that the third of these grounds goes only to the issue of damages, whereas Sipp's motion for partial summary judgment is directed solely at the issue of liability, and in any case this issue is not addressed by the parties in their briefing.

The policy purchased by Sipp provides that the insured is entitled to benefits if he is totally disabled. It is therefore a breach of contract by the insurer to fail to provide these benefits, if in fact the insured qualifies under the policy definition. Under the contract, "total disability" means that because of injury or sickness, the insured (a) is unable to perform the important duties of his regular occupation; and (b) he is not engaged in any other gainful occupation; and (c) he is under the regular and personal care of a physician. Sipp is not engaged in any gainful occupation, so the dispute centers around whether he is unable to perform his usual duties as a pastor, and whether he is under the regular care of a physician.

Sipp claims he is unable to perform his duties due to psychological problems, including depression. Evidence in favor of Plaintiff's position includes the following:

In a Vocational Rehabilitation Log dated August 1, 2000 (P's Ex. 4), Defendants' claims examiner noted that Sipp applied for disability due to "asthma and stress related depression as of 1/1/2000." The original claim made by Sipp is included with Defendants' brief, as Ex. 14 to the Sipp Deposition (D's Ex. 1). As part of this claim, the Attending Physician's Statement, signed by Dr. Judith Weisfuse, noted that Sipp has a primary diagnosis of "uncontrolled asthma" and a secondary diagnosis of "stress related depression."

In this Vocational Rehabilitation Log, the claims examiner noted that Sipp had been treated as of September 1999 by Bill Sanderson, L.C.S.W., for at least 12 sessions. He noted that Sipp was

"under a great deal of stress due to trauma two of his children recently experienced," and that his physician, Dr. Weisfuse, noted in October 1999 that Sipp was undergoing "a huge amount of emotional stress going on both professionally and personally" and that he was seeing a psychotherapist (apparently referring to Sanderson).  This report also noted Sanderson's summary in which he diagnosed acute stress disorder "which appeared largely due to this job as a minister," along with Sipp's daughter's severe marital problems and his son's hospitalization due to a mugging.

Much of the report dealt with Sipp's asthma problems, but the report concluded that Sipp had a "strong motivation for return to work," and that further documentation was needed as to Sipp's current capabilities and functional limitations, "both from a physical and psychological perspective."

In June 2000, a Medical Request Review Form (P's Ex. 7), signed by nurse Pat Ahearn, noted that Sipp had been diagnosed with "uncontrolled asthma, chronic sinusitis, and stress related depression."  The note stated that medical records had been received from Sipp's treating physician, Dr. Weisfuse, and from Sanderson, and that the records support an ongoing disability due to asthma. The note also mentioned that the Sanderson records indicated a problem with depression and stress related to work and family issues, and that a move to a new location may help with the asthma, in part because it would reduce the stress caused by his job.

Sanderson provided reports to Defendants (P's Ex. 9a, 9b), in which he stated that, although Sipp is free of any mental illness or personality disorder, he is diagnosed with acute stress disorder, DSM-IV 308.3, and that "this appears to be largely due to his job as a minister."  He noted problems with Sipp's congregation and family problems as well, and concluded:

> He decided to go out of work on medical disability and to use the time
> to seek counseling to mitigate his stress and to re-evaluate his
> ministerial career choice.  He has currently attended approximately 12

sessions and he has decided to leave his church and has sold his house and relocated ... He uses counseling effectively and has been learning stress management techniques. Initially, he was not sleeping and was eating too much. This is now controlled however he remains depressed and is chronically tired. I feel that he should receive considerably more counseling aimed at learning emotional resilience skills before he should return to work.

In a Psychiatric Assessment Form (P's Ex. 9b) dated August 1, 2000, Sanderson noted that Sipp had 16 visits between September 29, 1999 and May 3, 2000, that he was diagnosed with acute stress disorder, and that his score in the GAF (Global Assessment of Functioning scale) was 41, with the highest GAF score in the past year at 60.

Everyone discussing this issue on this record agrees that a GAF score of 41 is extremely low. Elliot Rapoport, Ph.D., who examined Sipp at the request of his attorney in April 2002, noted that a GAF of 41 "contemplates serious symptoms including suicidal ideations, severe obsessional rituals or any serious impairment in social, occupational, or school functioning." (P's Ex. 34). Jennifer Lish, Ph.D., Defendant's consulting psychologist, stated in her deposition that 41 is such a low rating that "40 would mean one should probably seriously consider hospitalizing the individual." (P's Ex. 21). (She also concluded that the score was so low that its accuracy was in question; however, she did not examine Sipp but merely looked at the record, which she herself acknowledged was not really sufficient to reach a valid conclusion).

After Sipp moved to New Mexico, he began seeing Dr. Cardasis at the Penasco Clinic. These medical records indicate that Sipp was suffering from "situational/job stress," "chronic fatigue," and "occupation related stress disorder." (P's Exs. 11, 12). In an affidavit (P's Ex. 17), Dr. Cardasis stated that he received a telephone call on April 2 (year not given – probably 2002) from Dr. Ralph Kaplan, a pulmonary specialist hired by Defendants, and advised him that Sipp's asthma was under

good control at that time.  He said that Dr. Kaplan did not ask him about how Sipp was handling his stress disorder "from which he still suffers and for which he is taking anti-depressant medication." Dr. Cardasis noted that Sipp was being treated for major depression, and that if he had been asked:

> how [Sipp's] combination of physical and emotional symptoms affected his ability to return to his ministry I would not have said he was able to return to work; rather I would have recommended him for an appropriate mental health assessment to consider his entire condition.  I would also have given considerable weight to the patient's self assessment, which is always of clinical significance and particularly so in the case of a person as motivated and conscientious as Rev. Sipp appears to be.

Sipp also began family counseling with Debra Wirth, L.P.C.C.  Her notes from February to April 2001 (P's Ex. 14) indicate that Sipp and his wife sought help for "problems in parenting styles"; however, she also noted Sipp's history of a dysfunctional family background and abusive adoptive parents, and that "[h]e reports being in the helping profession but having to take time off because of all the stress related to his employment and mother dying, child's hospitalization in a short period of time."  She later noted that Sipp appeared more anxious, that he reported symptoms of post-traumatic stress disorder, and that he experienced emotional stress from his last employment which translated into problems with the family.

On April 3, 2001, Sipp told claims examiner Barbara Fawcett that he was not ready emotionally or physically to return to work, that he "admitted he was having emotional problems and that the two [i.e., the asthma and the emotional problems] are linked," and that he was willing to work with Defendants' vocational staff in order to attempt to use his skills in other ways.  He told Fawcett he looked into going back to school to do social work but said he couldn't handle the stress of it.  (P's Ex. 22).

On April 23, 2001, Sipp was seen by psychiatrist Dr. Jafet Gonzales.  He was referred to Dr. Gonzales by Debra Wirth, the couples therapist whom Sipp and his wife had been seeing.  In this report  (P's Ex. 23), Dr. Gonzales stated that Sipp said it was "very hard for him to come and see a psychiatrist due to past bad experiences."  Sipp told Gonzales that he was having "difficulty functioning and unable to return to do his job as a minister, due to exhaustion, difficulty concentrating, with depression and anhedonia."  (Anhedonia is defined as "total loss of feeling of pleasure in acts that normally give pleasure, *see*, Dorland's Illustrated Medical Dictionary, 26th ed., at 80).

Dr. Gonzales' notes contain references to Sipp's job-related stress, which carried over into his home life.  He noted that Sipp "was out of work due to inability to function, he said stress but met criteria for major depression."  He noted Sipp's childhood difficulties, including neglect and physical and emotional abuse, and he seemed to indicate (his handwritten notes are difficult to read) that Sipp had behavior problems as a teenager, when he was treated for "what appears to be PTSD/OCD" and may have been prescribed Thorazine (an antipsychotic drug, *see* PDR, 53d ed., at 3101).

Dr. Gonzales further noted that Sipp experienced two episodes of depression as an adult.  His diagnosis was "major depression, recurrent, without psychosis, rule out bipolar [illegible], adjustment disorder, chronic."  He assigned a GAF of 57.  He recommended outpatient psychotherapy, and under vocational/educational, he noted "may need retraining."  He stated also that Sipp did not want to take medications "until he can be follow[ed?]" but that he will need medication if psychotherapy did not improve the symptoms.

In early 2002, Sipp began seeing Harry C. Linneman, Ph.D., Clinical Psychologist.  Dr. Linneman stated as follows in a letter to Plaintiff's counsel (P's Ex. 33):

I have seen Mr. Sipp four times in the past six weeks. He originally came to me because both he and his wife felt that he was not progressing well in his recovery after leaving his job as a minister under traumatic circumstances. My initial impression was of a very agitated, depressed, and emotionally volatile man who was rather desperate to find some relief from the pressures he was experiencing. These pressures stem in part from his departure from the church, and in part from his own negative self-evaluation about not being able to get himself together and function even minimally in normal life roles of a husband, father, and eventually breadwinner. Mr. Sipp appeared to be a rather driven man who wants to be successful at everything he attempts, even while he demonstrates very poor skills at setting appropriate limits and boundaries on what others can reasonably expect from him.

Further contacts with Mr. Sipp and his wife have only reinforced this initial impression ...

[I]t is my belief that it will be an extended period of time before he can reasonably be expected to perform well in virtually any job commensurate with his education and skills. In a recent meeting, I informed him that I think he should count on at least two to five years of recovery before he considers returning to work. When he half-jokingly said that he might have to get a fast-food job to pay the bills, I pointed out to him that he would probably not make it through one shift on such a job before his behavior led to his termination.

It might be useful to point out that Mr. Sipp is paying for his own treatment with me, even though he can ill afford it at the present time. He seems very motivated to hasten his recovery as much as he reasonably can.

Plaintiff's counsel retained two experts, clinical psychologist Elliot Rapoport, and vocational evaluator Dan Moriarty. Dr. Rapoport's report to Plaintiff's counsel (P's Ex. 34), and Dan Moriarty's report (P's Ex. 35), provide the following support for Sipp's claimed psychological disability.

Dr. Rapoport examined Sipp and administered a battery of psychological tests. Dr. Rapoport noted that Sipp's past job as Senior Pastor inherently involved significant stress, but that he also

experienced significant difficulties in interactions with members of his congregation, which seem to have exacerbated his asthma. Sipp stated he ultimately felt that he couldn't go on in the position, and he resigned from the church and moved to New Mexico. Sipp told Rapoport that "as he began to slow down and consider his situation he experienced a sense of 'crashing and burning' [and] he became irritable unfocused and unhappy." Sipp began taking antidepressant medication prescribed by Dr. Cardasis, although he later stopped taking it due to side effects.

Dr. Rapoport noted no symptoms of thought disorder; however, he said Sipp showed numerous signs of depression, particularly in discussing his prior job "and his reasonable concerns about his future in terms of his ability to directly act upon his calling." One of the tests given to Sipp indicated that he lives with "significant tension, unhappiness and pessimism," and that:

> Various stressors both past and present have adversely [a]ffected his self esteem and he views himself as ineffectual and powerless to change the direction of his life ... He reports difficulties concentrating and making decisions and the combination of hopelessness, anxiety and stress apparent in these scores ... place[s] him at increased risk for self harm.

Dr. Rapoport's report went on to state that Sipp's difficulties were consistent with a depressive experience, and that he was likely to display significant symptoms related to traumatic stress. He said that Sipp perceived the need for help in dealing with these problems, had a positive attitude toward personal change, and was receptive to psychotherapy, although "he may currently be too disorganized or feel too overwhelmed to be able to participate meaningfully in some forms of psychotherapy."

Other psychological tests administered by Dr. Rapoport indicated that Sipp was chronically disposed toward "affective malaise," or mood swings that interferes with his functioning, and that

current stressors were making greater demands than normal on his capacity to adapt. Sipp's chronic self criticism generates emotional pain and leaves him vulnerable to episodes of depression, Dr. Rapoport stated, and he diagnosed Sipp with Major Depressive Disorder, moderate in severity and chronic in duration. His recommendation was for antidepressant medication in conjunction with psychotherapy which, he noted, was precisely the course of treatment Sipp was then pursuing. He concluded:

> As a result of this disorder, but in all likelihood in conjunction with his medical difficulties, it is my opinion that Reverend Sipp is in no position to perform the important tasks of his previous employment as Senior Pastor. Indeed it is almost impossible to imagine that any individual even one with good medical health would be able to attend the duties of a Senior Pastor while simultaneously experiencing a chronic moderate major depressive disorder ...

> While there is little doubt as far as this examiner is concerned regarding the nature and magnitude of Revered Sipp's emotional difficulties, it should be noted that he has for most of his life functioned at a very high level under conditions involving a significant amount of stress and high job related demands. While I cannot of course address myself to the prognosis for his recovery for his medical difficulties, assuming that he is able to make such a recovery, it seems likely that he may eventually be able to return to his work as a Senior Pastor in a church though I do not expect him to be able to do so for an extended period of time maybe at least two to five years of recovery.

Dan Moriarty, Plaintiff's vocational consultant, noted in his report (P's Ex. 35) that Sipp's functional limitations related to anxiety and depression included an inability to concentrate, lack of energy, exhaustion and agitation. He noted that ministers typically work long and irregular hours and that they are frequently called on at short notice to visit the sick, comfort the dying and provide counseling to those in need.

Moriarty interviewed Sipp and found him to be open and credible. He noted that Sipp is

"extremely troubled by his inability to work and the resultant negative effects it has had on his life. After functioning so well with twenty years of experience in a skilled, highly stressed occupation, he finds himself unable to function even minimally as the breadwinner for his family."  Moriarty noted that Sipp had an increasingly difficult time during the two-hour interview in maintaining his concentration, and on three occasions Moriarty had to bring him back to the topic at hand.

Moriarty described in detail the abilities and skills required to perform satisfactorily as a pastor and concluded that Sipp "would definitely not be able to function effectively or even be considered for employment as a Pastor or Minister.  He would be unable to perform the varied and significant duties of this occupation ...  I would concur with Dr. Linneman's opinion that Mr. Sipp would not even be able to function in an unskilled, entry-level job."

Plaintiff faults Defendants for failing to conduct a thorough vocational assessment of Sipp's work as a pastor, which ought to precede a determination that he was capable of returning to that work. Instead, Plaintiff says, Defendants relied on Sipp's own description of what his job entailed and then failed to credit his own assertion that he can no longer do such things as counseling, delivering sermons and performing church ceremonies, managing the office.

Mike Speroni, Defendants' customer care consultant, stated at his deposition that the insurance company used only the information provided by Sipp in determining the type of work that Sipp performed (P's Ex. 3).  As Plaintiff argues, this would appear to violate Defendants' own guidelines, which require the carrier to "develop a thorough understanding of the work the claimant was performing immediately prior to disability."  There is no evidence on the record that Defendants made any attempt to do this.

In the face of the above evidence, indicating that Sipp suffers from major depression and that

he cannot perform the relevant functions of his former profession, Defendants contend that Sipp does not fall within the definition of "totally disabled" and that their determination to discontinue benefits was therefore reasonable under the terms of the policy.

The evidence Defendants present is as follows:

Defendants downplay evidence that Sipp was treated for depression, arguing that he "saw a social worker" (William Sanderson) for "stress" but did not seek treatment by a psychiatrist or psychologist in 2000 and never submitted an attending physician's statement claiming a disability due to a psychiatric condition. (D's Ex. 1).

Defendants continually refer to an alleged statement by Sipp's treating physician which released him to return to work as of January 2001. It is not at all clear that such a release was given. When Sipp moved to the New Mexico from New Jersey, there is no dispute that the climate and higher altitude had a beneficial effect on his asthma. In an attending physician's statement, Dr. Cardasis, Sipp's treating physician in New Mexico, stated that Sipp was being treated for "asthma, chest pain, and pneumonia," with no mention of psychological problems. In filling in blanks on Defendants' form, Dr. Cardasis answered the question, "How long will patient be unable to work in his/her occupation?," by writing, "12/4/00 to 1/31/01." However, in answer to the question "When do you feel patient could resume some work?," Dr. Cardasis wrote, "I don't know yet. Awaiting old records." (Ex. 23 to D's Ex. 1).

In this form, Dr. Cardasis deals only with Sipp's physical problems; he doesn't mention depression or any other psychological problem. It could be inferred that Dr. Cardasis was providing a physical medical release for Sipp to return to work on January 31, 2001, and that he assumed a mental health care provider would provide a separate psychological medical release. I n

addition, the form itself notes in boldface type that it is a "Monthly Progress Report" and "should be completed and returned to us on or about the same date each month." Given the conflict between the statement "I don't know yet. Awaiting old records," and the 1/31/01 date given as the outside time limit during which Sipp would be unable to work, Dr. Cardasis may well have assumed that he was only supposed to certify Sipp's inability to work for a one-month period, and that he would continue to fill out these forms from month to month.

These possible inferences do not create issues of fact, however, since the document is not, as Defendants would characterize it, a clear statement by Sipp's treating physician that Sipp was generally cleared to return to work as of January 31, 2001. And, in any event, Dr. Cardasis refutes this characterization in his affidavit (P's Ex. 17).

Defendants also point to the medical review of Sipp's file, done in March 2001 by nurse consultant Patricia Ahearn, as evidence that he was not disabled. (D's Ex. 5). Ahearn noted the improvement in Sipp's asthma since his move to New Mexico and noted also that his file was being transferred to Dr. Alfred Kaplan, a consulting pulmonologist. Dr. Kaplan reviewed Sipp's medical records and telephoned Sipp's treating physician, Dr. Cardasis. Cardasis told Kaplan that Sipp had no asthma-related limitations or restrictions on returning to work in his profession. Dr. Kaplan concluded that Sipp was not precluded from returning to his pastoral work as a result of his asthma. (D's Ex. 3).

However, Dr. Cardasis stated in his affidavit (P's Ex. 17) that when Defendants' consultant, Dr. Kaplan, called him to ask about Sipp's prognosis, he asked only about Sipp's asthma and did not inquire about any psychological problems. Since Dr. Kaplan is a pulmonologist, it makes some sense that he would not have inquired about the effect of Sipp's depression on his ability to return to work.

But Defendants did not ask anyone with psychological or psychiatric training to call Dr. Cardasis, and he says that if he had been asked how the combination of Sipp's physical and emotional symptoms affected his ability to return to the ministry, he would not have said that Sipp was able to return to work; rather, he would have recommended a mental health assessment.

Defendants also had Sipp's medical records reviewed by two psychologists, Ann Ward-Bennett, a psychiatric case manager, and Jennifer Lish, Ph.D. Neither of these providers examined or interviewed Sipp or conducted any psychological tests.

In a report dated May 3, 2001, Bennett summarized Sipp's medical record, including the report of Bill Sanderson and the notes of Debra Wirth. (P's Ex. 19). She concluded that Sanderson's diagnosis of acute stress disorder was not supported by the symptoms he described. She also felt that Sanderson's statement that Sipp "decided to go out of work on medical disability and use the time to seek counseling to mitigate his stress and re-evaluate his ministerial career choice" suggested that Sipp chose to leave his job because of "significantly stressful life events rather than psychiatric illness." She stated that Sipp was not taking psychotropic medication and was not referred for a psychiatric consultation. However, Bennett also noted Sanderson's assessment of 41 on the GAF scale and stated that this score "is indicative of some impairment in reality testing or communication or major impairment in several areas, such as work, family relations, judgment, thinking or mood."

Bennett concluded that, while Sipp appeared to have experienced anxiety and depressed mood and had limited coping skills that have left him ill-prepared to manage stressful situations, "there is no diagnostic formulation based on a constellation of symptoms provided by his treating sources to support a disabling condition other than an Adjustment Disorder with Mixed Anxiety and Depressed Mood." She noted that no psychiatric consultations had been made, and Sipp received only limited

treatment which he seems to have sought for help with marital and parenting issues. She referred the file for additional review to consulting clinical psychologist Jennifer Lish.

Lish concluded after reviewing Sipp's file that his medical records did not support a psychiatric impairment. (P/s Ex. 20). She stated that, because Sanderson sent a letter summarizing treatment, rather than his original notes, it is unclear whether Sipp's symptoms occurred all at the same time, or at different times, and whether they were mild, moderate, or severe, or for how long they persisted. Those symptoms were noted by Sanderson to include depressed mood, decreased sleep, increased appetite, decreased concentration, and fatigue. She says that, "[i]n the absence of documentation, of their co-occurrence, severity and chronicity, I must assume that these symptoms occurred separately and were transient and mild." She doesn't state why this assumption was more logical than the opposite assumption, or why she didn't simply call Sanderson and ask him these questions.

Lish also noted Sanderson's statement that Sipp was unable to function as a minister but added that "since Mr. Sanderson has not submitted session notes, it is not possible to independently validate his assertion that the Insured is incapable of functioning in his occupation because [o]f psychiatric illness." She concluded that, although Sipp had experienced some difficult life events which triggered depressive symptoms, there was no documentation of co-occurrence, severity or persistence. She assumed, therefore, that the symptoms "were mild in intensity, did not co-occur, and quickly and spontaneously resolved." Again, she doesn't state why this assumption is valid. Her final conclusion is that the file does not contain enough evidence to document a psychiatric impairment which would preclude occupational functioning.

Defendants argue that there is no medical evidence in the record showing that Sipp is totally

disabled by a psychological condition and that, to the contrary, there is the evidence from Kaplan and Lish that Sipp is able to return to his former occupation. As discussed above, however, Defendant's motion to strike certain of Plaintiff's medical evidence has been denied, and consequently, there is sufficient medical evidence from Plaintiff attesting to his inability to work due to psychological impairment. The only contrary evidence comes from psychologists who did not examine Sipp and whose opinions are criticized by Plaintiff's consulting psychologist, who did examine Sipp and who states, "It is simply not clear to this examiner why some bits of information were attended to very carefully whereas others see[m] to have been dismissed." (P's Ex. 34).

Defendants further argue that Sipp failed to establish one of the important elements of the definition of "total disability": that he was "under the regular and personal care of a physician" for the psychological problems. Defendants state that Sipp was never treated by a physician prior to 2001, "only social workers," and that he did not receive any treatment for his mental health condition after May 2000. They imply that his visit to a psychiatrist at that time was triggered by the fact that "his benefits were being challenged in 2001."

Plaintiff points out in response that all of Sipp's doctors, including his general practitioners, noted the existence of some psychological impairment, and his general doctor in New Mexico, Dr. Cardasis, prescribed antidepressants for his condition. In addition, Plaintiff argues, the contract states only that the insured must be under the regular and personal care of a physician; it does not say that he needs a separate doctor for each condition, and there is ample evidence of regular and personal treatment, for asthma and other conditions, by general practitioners who also noted and provided treatment for Sipp's psychological symptoms.

Defendants' statement, to the effect that Sipp only went to see a psychiatrist when he thought

24

he might lose his benefits, is not accurate. The record indicates, rather, that Sipp was not told that benefits were being denied until after he had seen Dr. Gonzales. (P's Exs. 22-24). There is some indication in the record that Sipp was initially reluctant to seek the help of a psychiatrist and resisted taking psychotropic medications, that his reluctance and resistance were symptoms of his depression and his personal techniques for dealing with it, and that he became aware, eventually, that he needed help with his problems and sought out diagnosis by a psychiatrist and counseling from a psychologist.

Dr. Gonzales did not indicate in his notes that Sipp would be seeing him on a continuing basis; rather, he recommended outpatient psychotherapy and noted a referral to "TCCS," which is not identified but which the Court assumes may be a clinic in Taos. Dr. Gonzales' notes (which are not completely legible) appear to read, "I will be leaving. Patient needs meds if psychotherapy doesn't improve symptoms." The fact that Sipp saw Dr. Gonzales only once does not mean that the Gonzales visit was a ploy to get undeserved disability benefits, as Defendants imply. Rather, Dr. Gonzales is apparently referring Sipp for further treatment, and Sipp followed up on this referral by beginning treatment with Dr. Linneman, the psychologist, and continuing this treatment on a regular basis.

Defendants imply in their brief that Sipp's problems with his former work and current unemployment are something within his control, that he made a choice to stop working and is now attempting to wrest benefits from them when he isn't really disabled. In their response to Plaintiff's motion for partial summary judgment, they note that Sipp had been having difficulties with his congregation as early as 1992 or 1993 "in which a certain female parishioner spread rumors about Sipp which he contends were 'aspersions on his character,'" and that he had interpersonal problems with other parishioners and with the governing board of the congregation. They imply that he quit he job in order to avoid being fired, rather than because of any disability. (Doc. 35, at 3 n.3).

However, the record is replete with medical opinions indicating that Sipp's personality traits and psychological depression interfered with his ability to interact well with his congregation, in what everyone acknowledges is a high-stress job. The record also indicates that he wanted to return to work and that his inability to be the family breadwinner was an additional stressor in his life. (P's Ex. 33, 34). His treating physicians refer to him as a conscientious, motivated, even driven person who wants to be successful at everything he attempts. (P's Exs. 17, 33).

The Court is not particularly impressed with Defendants' reference to Sipp's alleged problems with "a certain female parishioner," implying that a sex scandal of some sort drove Sipp from his job and that he is now trying to squeeze undeserved disability benefits from the insurance company. There is nothing on the record to support such an implication.

On the contrary, the record indicates that Sipp had a difficult childhood and stormy adolescence but that he turned his life around, completed his education, in spite of possible dyslexia or some other learning disability, and that he has worked hard in a very stressful occupation, all the while wrestling with symptoms of depression, anxiety and self-doubt. If the stressors to which he was subjected finally got the better of him to the point where he could no longer work and if, as a consequence, he is taking time out and getting professional assistance in order to find a new path in life and eventually return to work, that is exactly what disability insurance is meant for. Indeed, even if the record supported the insinuation that a sexual liaison with a parishioner caused or contributed to the cause of Sipp's emotional condition and resulting disability, it is of no consequence. There is no exclusion in the contract of insurance that would suspend Defedants' obligation to pay disability benefits if sexual misconduct were the root of Sipp's disability.

The record is clear that Sipp is psychologically disabled and will probably be unable to work

for some time in the future, and the Court holds that no reasonable jury could find otherwise. Defendants presented nothing to contrary, except the opinions of two psychologists who did not interview or examine Sipp but only looked through the record. Sipp should therefore be granted summary judgment on the breach of contract issue with respect to Defendants' discontinuation of his benefits on grounds that he is not totally disabled.

There is some dispute between the parties as to whether Defendants initially paid disability benefits to Sipp based solely on his asthma, or based on both asthma and depression. Defendants claim it was the former; Plaintiff claims it is the latter because, he argues, this would place the burden of proof on Defendants to show that the disability had ceased. The Court need not resolve this issue, since Plaintiff has established disability as a matter of law, regardless of where the burden of proof lies.

In addition to his claim that Defendants breached the insurance contract by discontinuing benefits, Sipp also alleges that Defendants breached the contract in other ways as well. He claims that they violated their contractual duty to conduct a full and fair investigation before denying Plaintiff benefits under the policy, and that they further breached the contract by failing to provide Sipp with copies of the consulting psychologists' reports which formed the basis for their denial of benefits. The Court, having found as a matter of law that Sipp is in fact disabled and that Plaintiffs breached their contract by finding otherwise, need not consider these alternatives arguments for breach of contract.

B. <u>Unfair insurance practices</u>

Although Sipp's counsel could conceivably have pled and argued a cause of action under the New Mexico Unfair Insurance Practices Act, N.M.S.A. § 59A-16-1 *et seq.*, they failed to do so in

27

the original complaint. The Court denied leave to amend the complaint to include such a claim, since the request to amend came too late in the litigation. [Doc. 32].

Plaintiff now argues that his vague reference in the complaint to "unfair insurance practices" which "violate statutory laws and regulations" constitutes a cause of action under Unfair Practices Act, N.M.S.A. § 57-12-1, *et seq*. He also contends that the pleadings are superseded by the Initial Pretrial Report ("IPTR") [Doc. 10], which includes as part of the "Plaintiff's Contentions" an allegation that "the claims investigation using telephone calls to doctors was a[n] alleged misstatement as to the difference of a mental illness as opposed to a stressful life event [and] was a[n] unfair insurance practice prohibited by 59A-16-20, NMSA."

The IPTR was filed on February 27, 2002. If Plaintiff thought that the statutory cause of action was included in this case by virtue of the IPTR, there would have been no need for him to later file a motion for leave to amend the complaint to include such a cause of action, as he did on June 6, 2002 [Doc. 18].

Plaintiff argued in the motion to amend that, as a result of deposition discovery and production of the claims manual, "Plaintiff has made more full and complete allegations regarding the nature and scope of the misrepresentations of defendants, and their lack of reasonable basis for various statements and assumptions, and justifying specific allegations to fairly put defendants on notice and to add a claim under the New Mexico Unfair Practice Act as well as the Unfair Insurance Claims Practice Act." The Court rejected this argument in denying leave to amend, as the new allegations could easily have been included in the initial complaint or raised in a motion to amend much earlier than was done.

Plaintiff now assumes that the statutory claim is included in the case, even though the Court

ruled that it could not be added. This is an incorrect assumption. Mention in the IPTR of particular statutory provisions does not cure the problem. Rule 16(e) provides that, "[a]fter any conference held pursuant to this rule, an order shall be entered reciting the action taken," and that "[t]his order shall control the subsequent course of the action unless modified by a subsequent order." The case law on this provision typically involves the superseding effect of a final Pretrial Order, not an IPTR; but even if Plaintiff's mention of the statutes in the IPTR did have the effect of adding explicit statutory claims, the IPTR was nevertheless "modified by a subsequent order," that is, the order denying leave to amend the complaint.

The Unfair Insurance Practices Act specifically disclaims the intent to preclude any "remedies available against the same conduct under the common law ...," N.M.S.A. § 59A-16-30. The Court therefore considered whether Plaintiff might have a common law cause of action for bad behavior by an insurance company. Defendant argues that "Sipp has not shown, nor can he, that New Mexico recognizes a negligence or statutory cause of action for violation of industry standards separate and apart from claims for bad faith and violations of the Unfair Trade Practices Act, which this Court has declined to allow in this case." (Doc. 35, at 11).

Although it is possible that counsel was attempting, in the portion of the original complaint headed "Fourth Claim for Relief, Unfair Insurance Practices," to state a cause of action for bad faith in claims handling practices. However, in his proposed amended complaint, Plaintiff included a specific claim for "Bad Faith," or violation of the duty of good faith and fair dealing to treat the insured interests on an equal footing with that of the insurer. As noted above, however, the request to amend came too late and was therefore denied.

The common law bad faith cause of action is recognized in New Mexico. "[W]ith insurance

29

contracts, as with every contract, there is an implied covenant of good faith and fair dealing that the insurer will not injure its policyholder's right to receive the full benefits of the contract." <u>Dairyland Ins. Co. v. Herman</u>, 124 N.M. 624, 628, 954 P.2d 56, 60 (1997). The insurer must not be partial to its own interests, but must give its interests and the interests of its insured equal consideration. <u>Id.</u>, 124 N.M. 629.

In the order denying amendment, the Court disallowed the addition of this cause of action. In his briefing on these summary judgment motions, however, Plaintiff attempts to include this claim even though it has been specifically excluded by the Court. Plaintiffs included in their exhibits the expert report of Barbara J. Paull, which deals with the bad faith issue (P's Ex. 26), but they withdrew this exhibit "without prejudice" when Defendants moved to exclude it among other summary judgment exhibits submitted by Plaintiffs. (Doc. 42, at 2). Because Plaintiff failed to include, in a timely fashion, a claim for bad faith, and because the allegations of the original complaint do not state a cognizable claim for "insurance practices" violations, Defendants' summary judgment motion will be granted on this claim.

C. <u>Negligent misrepresentation</u>

Plaintiff alleges in the complaint, under the heading of "negligent misrepresentation," that Defendants' "representations pertaining to his eligibility were inaccurate and untrue," and "[t]he representations by the Defendants were negligent and in reckless disregard of the truth and they were intended to deceive the Plaintiff and to deny him payment of disability benefits to which he was entitled."

These allegations are rather vague, and Plaintiff's briefing does not clarify what facts he intends to allege in support of this cause of action. However, a portion of his argument is devoted

to a claimed misrepresentation, which Plaintiff describes as follows:

> Defendants claimed that the reason for the termination was that Plaintiff's disability was from 'stressful life events' instead of 'illness,' and other circuitous reasons; and when requested listed 13 providers, omitting the two determinant sources. The real reason for their determination is Dr. Lish's problematic concl[u]sion that Plaintiff was suffering from 'no impairment.'

(Doc. 28, at 16). Plaintiff argues that this constitutes misrepresentation. It does not. Rather, the allegation simply restates Plaintiff's claim that Defendants breached the contract by wrongfully discontinuing benefits.

To prevail under a theory of negligent misrepresentation, plaintiff must show: (1) the defendant made a material misrepresentation of fact to the plaintiff; (2) plaintiff relied on the representation; (3) defendant knew the misrepresentation was false at the time it was made, or made it recklessly; and (4) defendant intended to induce plaintiff to rely on the misrepresentation. Parker v. E.I. DuPont de Nemours & Co., 121 N.M. 120, 132, 909 P.2d 1, 13 (Ct. App. 1995).

Sipp contends that Defendants "misrepresented" the reasons for denial or discontinuation of benefits, in that they stated he was suffering from mere "stressful life events" rather than an illness. The Court has concluded, as discussed above, that Defendants were clearly wrong in coming to this conclusion and that a jury could not find otherwise. However, Defendants' conclusion is not a "misrepresentation" but rather is one party's opinion, reached after some analysis (however faulty) of the circumstances. Plaintiff has a different opinion, which the Court shares, but that does not render Defendants' statement of the reasons for denial a "misrepresentation" in the sense of being untrue or recklessly made.

Sipp sets forth several statements by Defendants which he claims constitute

misrepresentations, including the statement in the denial letter which reads, "we ... do not find evidence to support your claimed disability," the statement that Dr. Cardasis "informed us that you have no restrictions or limitations from returning to work at your profession," the statement regarding Sipp's "life choice" to resign from his job because of problems with his congregation, and the failure of Defendants to disclose that they relied on in-house psychological reviews in denying benefits.

Defendants point out that they did tell Sipp that the denial was based on "psychiatric review of your records."  In addition, they were told by Dr. Cardasis that Sipp's disability would continue until January 31, 2001; as discussed above, the proper interpretation of this statement under the circumstances is subject to dispute, but Defendants' citation of Dr. Cardasis' opinion is not a "misrepresentation."  Finally, the statements that Defendants did not find evidence to support a disability, and that Plaintiff's decision to resign was a "choice" rather than something forced upon him by disability are, again, merely differences of opinion between Defendants and Plaintiff; they do not constitute misrepresentations of fact.

Having determined that no misrepresentations were made, the Court need not address the other elements of the cause of action for negligent misrepresentation.  Defendants will be granted summary judgment on this issue.

D.  Punitive damages

Finally, summary judgment is granted to Defendants on the punitive damages claim.  There is simply no evidence on the record that Defendants acted maliciously or recklessly in their claims handling process.

As Defendants correctly point out, Sipp cites no testimony of deponents, or any other evidence, to show that Defendants' employees were prejudiced against Sipp, intended him harm, or

committed a wrongful act against him with knowledge that it was wrong. The Court agrees with Defendants' statement that, "Rather, the evidence establishes that Defendants' representatives were simply doing their job, without any malicious intent." (Doc. 33, at 7). Whether or not they did their jobs as thoroughly and competently as they could have, Plaintiff has not shown that their actions rose to the level of malice or reckless conduct so as to justify imposing punitive damages.

**Conclusion**

The Court having dismissed all of Sipp's common law claims and demand for punitive damages, but having found that Sipp is entitled to his contract disability benefits, it appears that no further matters remain to be resolved by a fact-finder. Sipp is entitled to an award of disability benefits from the time they were terminated until present; he is entitled to future disability benefits hereafter to the extent authorized by the policy of insurance.

**Order**

IT IS THEREFORE ORDERED that Plaintiff's Motion to Strike Defense of Failure to Mitigate Damages in Relation to Duty to Find Alternate Employment [Doc. 20], is granted;

IT IS FURTHER ORDERED that Defendants' Motion to Strike Summary Judgment Evidence [Doc. 34] is denied in principal part, except it is granted with respect to Plaintiff's Exhibits 28 and 29;

IT IS FURTHER ORDERED that Plaintiff's Motion for Partial Summary Judgment [Doc. 28] is granted in part, with respect to Plaintiff's claims for breach of contract by discontinuing benefits on the basis that he is not totally disabled; and

IT IS FURTHER ORDERED that Defendants' Cross Motion for Partial Summary Judgment [Doc. 33] is granted with respect to Plaintiff's claims for negligent misrepresentation, unfair insurance practices, and punitive damages.

Lorenzo F. Garcia
United States Magistrate Judge